MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2014 ME 102
Docket:        Yor-13-511
Argued:        May 15, 2014
Decided:       August 7, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

FRANCIS SMALL HERITAGE TRUST, INC.

v.

TOWN OF LIMINGTON et al.

SILVER, J.

[¶1]   The Town of Limington appeals from a judgment entered in the Superior Court (York County, *Fritzsche, J.*) vacating a decision of the State Board of Property Tax Review.  The Town argues that (1) the Superior Court erred in vacating the Board's ruling that Francis Small Heritage Trust, Inc., is not entitled to a tax exemption as a benevolent and charitable institution pursuant to 36 M.R.S. § 652(1)(A), (C) (2013), and (2) the Board did not err in concluding that the Town correctly applied the "[a]lternative valuation method" of 36 M.R.S. § 1106-A(2) (2013) to the Trust's properties that are classified as open space land pursuant to Maine's Farm and Open Space Tax Law, 36 M.R.S. §§ 1101-1121 (2013).[1]  This

---

[1]  Various provisions of the Farm and Open Space Tax Law, including 36 M.R.S. § 1106-A (2013), have been amended since the 2009 and 2010 tax years at issue in this case.  *See, e.g.*, P.L. 2011, ch. 240, §§ 7-8 (effective Sept. 28, 2011) (codified as amended at 36 M.R.S. § 1109(1), (3) (2013)); P.L. 2011, ch. 618, §§ 6-7 (effective Aug. 30, 2012) (codified at 36 M.R.S. § 1106-A(2)-(3)).  Those amendments do not affect this appeal.

2

opinion gives us the opportunity to review the real estate tax status of land fully devoted to conservation and free public access. Because we conclude that the Trust is entitled to a charitable exemption, we affirm the judgment.

## I. BACKGROUND

[¶2]    The following facts are drawn from the administrative record developed before the Board. The Trust owns eleven contiguous parcels of land on and near Sawyer Mountain in Limington. Three of the parcels have historically been taxed pursuant to the Maine Tree Growth Tax Law, 36 M.R.S. §§ 571 to 584-A (2013).[2] The remaining eight parcels are classified as open space land pursuant to the Farm and Open Space Tax Law, 36 M.R.S. §§ 1101-1121. The open space properties are protected by third-party, "forever-wild" conservation easements, and some of the parcels are also further protected by easements held by the Department of Inland Fisheries and Wildlife as part of the Land for Maine's Future program.

[¶3] The Trust's purposes are "to conserve natural resources and to provide free public access to those natural resources." To that end, the Trust's properties are "used and operated as conserved wildlife habitat," and are open to the public 365 days a year. Local schools use the properties for field trips and environmental

---

[2]  Various provisions of the Maine Tree Growth Tax Law have been amended since the 2009 and 2010 tax years at issue in this case. *See, e.g.*, P.L. 2013, ch. 405, § A-23 (effective Oct. 9, 2013) (codified at 36 M.R.S. §§ 575-A, 577, 579, 581-F to 581-G (2013). Those amendments do not affect this appeal.

education.  The Trust's land is also open for hunting, fishing, hiking, cross-country skiing, and snowmobiling.  In addition, the Trust has engaged in other activities, such as sponsoring a Limington Boy Scout Troop, participating in a project with Maine Medical Center to research the risk of exposure to Lyme-disease-transmitting deer ticks, and conducting a workshop on invasive plants.  The Trust also holds a conservation easement on a commercial farm in the town of Parsonsfield.  The Trust's Articles of Incorporation set forth the purposes of the Trust:

> *The corporation is organized exclusively for charitable, educational, and scientific purposes* within the meaning of Section 501(c)(3) of the Internal Revenue Code and Title 13-B of the Maine Revised Statutes. The nature of the activities to be conducted and the purposes to be promoted or carried out by the corporation are as follows:
>
> (a)　*The receipt and administration of property and funds for the promotion of conservation and preservation of the natural resources* primarily in, but not limited to, the Towns of Cornish, Limerick and Limington, County of York, state of Maine *for the benefit of the general public*, including land and water resources, plant and animal life, and areas of scenic, agricultural, ecological or educational significance therein;
>
> (b)　In conformity with the purposes set forth in this paragraph, the corporation shall accept by gift, devise or bequest, but may also obtain by purchase, lease, or otherwise, property and interests therein, including, but not limited to, developmental rights therein, and other property, real, personal or mixed, of historic, scenic, agricultural and natural significance. *Other specific purposes of the corporation shall be to* maintain open space and preserves for wildlife and plant life, *protect appropriate uses such as logging, farming and other compatible commercial activities within specified areas and adjacent*

4

> *areas*, engage in and promote scientific study and education regarding natural resources, to demonstrate and teach the necessity of preserving our natural heritage by conservation and preservation so that future generations may enjoy it, and to protect and promote the utilization of properties for hunting, fishing, hiking, cross country skiing and other compatible uses.

(Emphasis added.)

[¶4]  For tax purposes, the assessed value of open space land is governed by 36 M.R.S. § 1106-A, which provides that, if the assessor cannot determine the market price of the property, the assessor may employ an "[a]lternative valuation method." *Id.* § 1106-A(1), (2).  Pursuant to the alternative valuation method, "[t]he assessor may reduce the ordinary assessed valuation of the land, without regard to conservation easement restrictions," by up to 95% if the land meets certain statutory criteria.[3]  *Id.* § 1106-A(2).  Section 1106-A(2) further provides,

---

[3]  The statute provides in relevant part:

> The assessor may reduce the ordinary assessed valuation of the land, without regard to conservation easement restrictions and as reduced by the certified ratio, by the cumulative percentage reduction for which the land is eligible according to the following categories.
>
> > **A.** All open space land is eligible for a reduction of 20%.
> >
> > **B.** Permanently protected open space land is eligible for the reduction set in paragraph A and an additional 30%.
> >
> > **C.** Forever wild open space land is eligible for the reduction set in paragraphs A and B and an additional 20%.
> >
> > **D.** Public access open space land is eligible for the applicable reduction set in paragraph A, B or C and an additional 25%.

however, that "[n]otwithstanding this section, the value of forested open space land may not be reduced to less than the value it would have under [the Maine Tree Growth Tax Law], and the open space land valuation may not exceed just value as required under [36 M.R.S. § 701-A (2013)]."

[¶5]  In assessing the Trust's open space properties, the Town utilized the alternative valuation method.  Because the Town's valuation of the properties, as reduced pursuant to section 1106-A(2)(A)-(D), fell below the value of the properties pursuant to the Maine Tree Growth Tax Law, the Town instead used the tree growth value.  The Town did not have data regarding the mixture of trees for one of the Trust's open space parcels because it had never been enrolled in the tree growth program, so the Town instead used the full value of that parcel as reduced pursuant to section 1106-A(2)(A)-(D).

[¶6]  The Trust requested tax abatement on its eleven properties for the 2009 and 2010 tax years, contending that the properties should be granted tax-exempt status, and that, if the properties are not exempt, the Town overvalued the eight open space lots by misapplying the alternative valuation method set forth in 36 M.R.S. § 1106-A(2).  The Town denied the Trust's petitions, and the Trust appealed to the Board.

---

36 M.R.S. § 1106-A(2)(A)-(D) (2013).  Subsection (3) of the statute defines "[p]ermanently protected open space," "[f]orever wild open space," and "[p]ublic access open space."  36 M.R.S. § 1106-A(3)(A)-(C).  The Town does not dispute that the Trust's open space properties meet all of these criteria and are eligible for a 95% reduction in assessed value.

6

[¶7] The Board consolidated the Trust's appeals and held evidentiary hearings on July 19 and 20, 2011, and September 9, 2011. The Board received the testimony of several witnesses, including Richard Jarrett, the treasurer of the Trust and a member of its board of directors. Jarrett testified that the "compatible commercial activities" provision of the Trust's Articles of Incorporation permitted the Trust to engage in forestry. The Trust, Jarrett testified, plans to use its tree growth parcels for an educational program on sustainable tree harvesting, with any revenue flowing back into the Trust to be used in accordance with its purposes. Jarrett also testified that heavily encumbered conservation land is more of a financial liability than an asset, and that transfers of such property are generally for nominal value and often accompanied by a donation of "stewardship" funds for the maintenance of the property.

[¶8] By a written decision dated August 22, 2012, the Board denied the Trust's appeals. The Board concluded that the Trust was not entitled to a tax exemption because "its activities are not restricted solely to benevolent and charitable purposes." In reaching this conclusion, the Board relied on several facts: (1) the Trust's Articles of Incorporation permitted the Trust to "engage" in commercial activities such as farming and logging; (2) Jarrett, the Trust's treasurer, interpreted the commercial activities provision of the Articles to permit the Trust to engage in forestry; (3) three of the Trust's parcels were enrolled in the tree growth

program; and (4) the Trust "own[s]" a commercial farm in Parsonsfield. The Board also reasoned that the Trust's property could not be exempt because eight of the Trust's properties were classified as open space land and already enjoyed substantial tax relief, relying in part on *Cushing Nature & Preservation Center v. Inhabitants of the Town of Cushing*, No. Civ.A.CV99-059, 2001 WL 1729095, at *6 (Me. Super. Ct. May 30, 2001), *vacated on other grounds*, 2001 ME 149, 785 A.2d 342.

[¶9] With respect to the valuation issue, the Board concluded that the plain language of section 1106-A(2) supported the Town's use of the tree growth value where the 95% reduction resulted in a value less than the tree growth value. The Board also rejected the Trust's argument that the fair market value of the properties was nominal due to restrictions on their use because the Board found Jarrett's "unsupported testimony not persuasive and therefore insufficient to overcome the presumption that the assessors' valuation is valid."

[¶10] The Trust appealed the Board's decision to the Superior Court pursuant to M.R. Civ. P. 80C and 5 M.R.S. §§ 11001-11008 (2013). The Superior Court vacated the Board's decision, concluding that the Trust was entitled to a tax exemption as a benevolent and charitable institution. The court reasoned that the Trust's Articles of Incorporation permitted only the "protection" of logging, farming, and other compatible commercial activities, and did not actually authorize

8

the Trust to engage in them, and that any revenue derived by the Trust from such commercial activities was purely incidental. The court further reasoned that nothing in the Maine Tree Growth Tax Law or the Farm and Open Space Tax Law precluded exemption of the Trust's property as that of a benevolent and charitable institution. The court did not reach the issue of the Town's valuation of the Trust's open space properties. The Town timely appealed.[4]

## II. DISCUSSION

A. Standard of Review

[¶11] Because the Superior Court acted in its appellate capacity, we review the decision of the Board directly without deference to the Superior Court's intermediate review. *See Humboldt Field Research Inst. v. Town of Steuben*, 2011 ME 130, ¶¶ 3-4, 36 A.3d 873; *Mar. Energy v. Fund Ins. Review Bd.*, 2001 ME 45, ¶ 7, 767 A.2d 812. We review the Board's decision for abuse of discretion, errors of law, or findings not supported by the evidence. *Mar. Energy*, 2001 ME 45, ¶ 7, 767 A.2d 812.

B. Analysis

[¶12] As a general rule, all real estate in Maine is subject to taxation. 36 M.R.S. § 502 (2013); *Hebron Acad., Inc. v. Town of Hebron*, 2013 ME 15, ¶ 7,

---

[4] Amici Maine Coast Heritage Trust and Land Trust Alliance, Inc., filed a brief in support of the Trust.

60 A.3d 774. Legislatively established state policy encouraging charitable use of land, however, establishes that an organization's property is exempt from taxation if (1) the organization claiming the exemption is "organized and conducted exclusively for benevolent and charitable purposes," and (2) the property is "owned and occupied or used solely for [the organization's] own purposes." 36 M.R.S. § 652(1)(A), (C)(1). Because the Town does not argue that the Trust does not own, occupy, and use the property in question solely for its own purposes, we address only whether the Trust is "organized and conducted exclusively for benevolent and charitable purposes." *Id.*

[¶13] Whether a purpose is benevolent and charitable within the meaning of section 652(1) is a question of law that we review de novo. *Cushing Nature & Pres. Ctr. v. Town of Cushing*, 2001 ME 149, ¶ 10, 785 A.2d 342. Because "[t]axation is the rule and exemption the exception," *Green Acre Baha'i Inst. v. Town of Eliot*, 150 Me. 350, 353, 110 A.2d 581 (Me. 1954), the burden is on the party seeking the exemption to prove that it falls "unmistakably within the spirit and intent of the act creating the exemption," *Hebron Acad.*, 2013 ME 15, ¶ 7, 60 A.3d 774 (quotation marks omitted). In cases where the charitable exemption is claimed,

> there must be a careful examination to determine whether in fact the institution is organized and conducting its operation for purely benevolent and charitable purposes in good faith, whether there is any

profit motive revealed or concealed, whether there is any pretense to avoid taxation, and whether any production of revenue is purely incidental to a dominant purpose which is benevolent and charitable. When these questions are answered favorably to the petitioner for exemption, the property may not be taxed.

*Christian Fellowship & Renewal Ctr. v. Town of Limington*, 2006 ME 44, ¶ 17, 896 A.2d 287 (quoting *Green Acre*, 150 Me. at 354, 110 A.2d 581).

[¶14]  We have construed the word "benevolent" as synonymous with the word "charitable." *Id.* ¶ 13.  An activity or purpose is "charitable" if it is

for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.

*Id.* ¶ 14 (quoting *Episcopal Camp Found., Inc. v. Town of Hope*, 666 A.2d 108, 110 (Me. 1995)).  Part of the rationale for granting exemption for charitable institutions is that

[a]ny institution which by its charitable activities relieves the government of part of [its] burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a "quid pro quo" for its services in providing something which otherwise the government would have to provide.

*Episcopal Camp*, 666 A.2d at 110 (alterations in original) (quotation marks omitted).  This "quid pro quo" factor, although not controlling, is one courts should consider in determining whether the charitable exemption applies.  *Christian*

*Fellowship*, 2006 ME 44, ¶¶ 24, 35, 896 A.2d 287. Providing opportunities for even "casual and limited group recreational and relaxation activities" can constitute a quid pro quo because it "provid[es] something that government would otherwise provide, through the government system of parks, public lands, and recreational facilities." *Id.* ¶ 37 (quotation marks omitted).

[¶15] We have not directly addressed whether land conservation constitutes a charitable purpose within the meaning of section 652(1). *See Cushing*, 2001 ME 149, ¶ 15, 785 A.2d 342 (declining to reach the issue of "whether land conservation or preservation, standing alone, could constitute a charitable use"). We have, however, considered whether wildlife refuges qualify for exemption. In *Holbrook Island Sanctuary v. Inhabitants of the Town of Brooksville*, 161 Me. 476, 477, 484, 214 A.2d 660 (Me. 1965), the plaintiff organization sought exemption of property it operated as a wildlife sanctuary or game preserve. Public access to the plaintiff's property was strictly limited:

> The corporation employed a full-time Warden . . . with an additional helper during the summer months and the hunting season. All persons wishing to enter the sanctuary were and are asked to register at the office and to apply to the Warden for permission to enter the sanctuary. Persons and organizations engaged in nature study were permitted in the Sanctuary accompanied by the Warden for the purpose of nature study, observation and photography. The public was directed not to enter the sanctuary for any other purpose. The Warden and his assistant were instructed to prohibit hunting in the area.

12

*Id.* at 480-81. The plaintiff blocked off existing access roads on the property, with the intention of permitting the roads to become overgrown and return to their natural state. *Id.* at 480. We concluded that the organization at issue was not "charitable," because it was "nothing in substance more than a game preserve," the purpose of which was "plainly to benefit wild animals"; provided "no benefit to the community or to the public"; and was contrary to public policy favoring state-regulated game management areas. *Id.* at 484-88; *see also Silverman v. Town of Alton*, 451 A.2d 103, 106 (Me. 1982) (holding that a wildlife refuge was not "in and of itself . . . a scientific institution or organization" pursuant to 36 M.R.S. § 652(1)(B) (2013), and that the "incidental scientific objective to benefit the University of Maine by permitting use of the premises" was insufficient to bring the property within the exemption).

[¶16] The Town suggests that our holdings in *Holbrook* and *Silverman* control this case. Amici Maine Coast Heritage Trust and Land Trust Alliance, Inc., in turn, urge us to overrule or limit *Holbrook*, citing scholarly criticism of that decision. *See* Kirk G. Siegel, Comment, *Weighing the Costs and Benefits of Property Tax Exemption: Nonprofit Organization Land Conservation*, 49 Me. L. Rev. 399, 416 (1997) ("[*Holbrook*'s] holding, that a benefit to wild animals did not equate to a benefit to the community and was therefore not

charitable, might be assessed differently by a court with a modern awareness of the public benefits of ecosystem preservation.").

[¶17] We conclude that both *Holbrook* and *Silverman* are distinguishable. Our holding in *Holbrook* was based on the absence of any benefit to the public of a game preserve operated in a manner that heavily restricted public access and was contrary to public policy. *See Holbrook*, 161 Me. at 480-81, 484-88, 214 A.2d 660. As we discuss further below, neither rationale applies here. *Silverman* is also inapposite, as it did not apply the exemption for benevolent and charitable organizations, but rather the exemption for scientific institutions. 451 A.2d at 105-06.

[¶18] Appellate courts in several other jurisdictions have concluded that land conservation is a charitable purpose, at least when coupled with public access, or where conservation of the land otherwise confers a public benefit. *See, e.g.*, *Santa Catalina Island Conservancy v. Cnty. of L.A.*, 178 Cal. Rptr. 708, 716 (Ct. App. 1981) (concluding that "nonprofit organizations formed and conducted for the purpose of preserving natural environments and recreational opportunities for the benefit of the public come within the term 'charitable' as defined by the decisions of our Supreme Court by lessening the burdens of government"); *Turner v. Trust for Pub. Land*, 445 So. 2d 1124, 1124, 1126 (Fla. Dist. Ct. App. 1984) (holding that a nonprofit corporation's conservation of land in its natural state

entitled it to tax exemption pursuant to a Florida statute defining a charitable purpose as "a function or service which is of such a community service that its discontinuance could legally result in the allocation of public funds for the continuance of the function or service" (quotation marks omitted)); *Pecos River Open Spaces, Inc. v. Cnty. of San Miguel*, No. 30,865, 2013 WL 309847, at \*5, \*7 (N.M. Ct. App. Jan. 11, 2013) (holding that, "owing to the substantial public benefit derived from conservation of the Property, conservation in this case constitutes a charitable purpose that qualifies the Property for a tax exemption" pursuant to the New Mexico Constitution); *Mohonk Trust v. Bd. of Assessors*, 392 N.E.2d 876, 878-80 (N.Y. 1979) (concluding that a trust whose purpose was "preservation of wilderness areas for the benefit of the public" was entitled to exemption pursuant to statute exempting property used exclusively for "religious, charitable, hospital, educational, moral or mental improvement of men, women or children or cemetery purposes" (quotation marks omitted)); *Little Miami, Inc. v. Kinney*, 428 N.E.2d 859, 860 (Ohio 1981) (per curiam) (holding that an organization's restoration of an island to its natural state and continued efforts to preserve the island were in furtherance of charitable purposes and rendered the property exempt); *see also Trustees of Vt. Wild Land Found. v. Town of Pittsford*, 407 A.2d 174, 175-77 (Vt. 1979) (holding that land preserved in an undeveloped state was not exempt as a "public, pious or charitable use[]" where public access to

the land was strictly limited (quotation marks omitted)). Several of these holdings were based in part on legislative recognition of a public policy in favor of conservation. *See Santa Catalina*, 178 Cal. Rptr. at 716; *Turner*, 445 So. 2d at 1126; *Pecos River*, 2013 WL 309847, at *3-5.

[¶19] Most recently, in *New England Forestry Foundation, Inc. v. Board of Assessors of Hawley*, 9 N.E.3d 310, 312-13 (Mass. 2014), the Supreme Judicial Court of Massachusetts held that a nonprofit land conservation organization was entitled to a tax exemption as a charitable organization. The organization's stated purpose was, in part, to "create, foster, and support conservation, habitat, water resource, open space preservation, recreational, and other activities by promoting, supporting, and practicing forest management policies and techniques to increase the production of timber in an ecologically and economically prudent manner." *Id.* at 313 (quotation marks omitted). The property at issue was a 120-acre parcel abutting a state forest that the organization maintained in an undeveloped state using sustainable forestry practices and opened for public recreation. *Id.* at 313-14, 321, 325-26. The Massachusetts court concluded that the organization's purposes were charitable because the environmental benefits of holding land in its natural state "inure[d] to an indefinite number of people," and because the organization "lessen[ed] the burdens of government" by "assist[ing] the State in achieving its conservation policy goals." *Id.* at 320-23.

16

[¶20] There can be little doubt that the Legislature has enunciated a strong public policy in favor of the protection and conservation of the natural resources and scenic beauty of Maine. For example, 38 M.R.S. § 480-A (2013) states:

> The Legislature finds and declares that the State's rivers and streams, great ponds, fragile mountain areas, freshwater wetlands, significant wildlife habitat, coastal wetlands and coastal sand dunes systems are resources of state significance. These resources have great scenic beauty and unique characteristics, unsurpassed recreational, cultural, historical and environmental value of present and future benefit to the citizens of the State and that uses are causing the rapid degradation and, in some cases, the destruction of these critical resources, producing significant adverse economic and environmental impacts and threatening the health, safety and general welfare of the citizens of the State.

> . . . .

> The Legislature further finds and declares that the cumulative effect of frequent minor alterations and occasional major alterations of these resources poses a substantial threat to the environment and economy of the State and its quality of life.

*See also* 5 M.R.S. § 6200 (2013) (finding that "the continued availability of public access to [outdoor] recreation opportunities and the protection of the scenic and natural environment are essential for preserving the State's high quality of life" and that the "public interest in the future quality and availability for all Maine people of lands for recreation and conservation is best served by significant additions of lands to the public domain"); 30-A M.R.S. § 4312(3)(F) (2013) (identifying the protection of "critical natural resources, including without

limitation, wetlands, wildlife and fisheries habitat, sand dunes, shorelands, scenic vistas and unique natural areas" as a state goal). In creating the Land for Maine's Future program, the Legislature declared that

> the future social and economic well-being of the citizens of this State depends upon maintaining the quality and availability of natural areas for recreation, hunting and fishing, conservation, wildlife habitat, vital ecologic functions and scenic beauty and that *the State, as the public's trustee, has a responsibility and a duty to pursue an aggressive and coordinated policy to assure that this Maine heritage is passed on to future generations*.

5 M.R.S. § 6200 (emphasis added). The Legislature also recognized the important role played by conservation organizations in achieving these goals. *See id.* (finding that "Maine's private, nonprofit organizations . . . have made significant contributions to the protection of the State's natural areas and . . . should be encouraged to further expand and coordinate their efforts").

[¶21] Against this legal backdrop, we consider whether the Trust is organized and conducted for benevolent and charitable purposes pursuant to Maine law. The Trust's purpose is to conserve natural resources for the benefit of the public. The Trust has opened its properties to the public year-round, free of charge, and permits school field trips, hunting, fishing, hiking, cross-country skiing, and snowmobiling. As the Superior Court determined, the Trust essentially operates its properties in the manner of a state park in the Sawyer Mountain region. In doing so, the Trust assists the state in achieving its conservation goals, *see, e.g.,*

5 M.R.S. § 6200; 30-A M.R.S. § 4312(3)(F); 38 M.R.S. § 480-A, and "provid[es] something that government would otherwise provide, through the government system of parks, public lands, and recreational facilities," *Christian Fellowship*, 2006 ME 44, ¶ 37, 896 A.2d 287 (quotation marks omitted). We therefore hold that, under the circumstances of this case, the Trust is organized and conducted for benevolent and charitable purposes within the meaning of section 652(1)(C)(1).

[¶22] The Board reached the opposite conclusion in part because the Trust's Articles of Incorporation permit it to "engage" in "appropriate uses such as logging, farming and other compatible commercial activities." It also found that the Trust "owned" a commercial farm in Parsonsfield. We are not persuaded by this analysis. The Trust's Articles of Incorporation state, amongst a list of purposes, that "[o]ther specific purposes of the corporation shall be to . . . *protect* appropriate uses such as logging, farming and other compatible commercial activities within specified areas and adjacent areas."[5] (Emphasis added.) Moreover, there was no evidence that the Trust owns a commercial farm; rather, the testimony indicated that the Trust holds a *conservation easement* on a farm

---

[5] The Trust's treasurer did testify that the "compatible commercial activities" language in the Trust's Articles of Incorporation permitted the Trust to engage in forestry. Even if we assume that the Articles of Incorporation do permit the Trust to engage in forestry and that such use would be nonexempt in the circumstances of this case, we have made clear that incidental, nonexempt use of property will not render the property ineligible for exemption. *See Hebron Acad., Inc. v. Town of Hebron*, 2013 ME 15, ¶¶ 20-26, 60 A.3d 774. A logical corollary to that holding is that an organization's incorporating documents may authorize the organization to engage in such incidental use without destroying the exemption. *See id.*

property in Parsonsfield, protecting the property from further development. The treasurer of the Trust testified that the Trust plans to harvest its tree growth parcels, but only as part of an educational program on sustainable tree harvesting, with any revenue flowing back into the Trust to be used in accordance with its purposes. An educational program on sustainable forestry is consistent with the Trust's charitable purposes. *See* 36 M.R.S. §§ 563-564, 572 (2013) (declaring encouragement of operation of forest land on a "sustained yield basis" as the public policy of Maine).

[¶23] The Board also based its conclusion that the Trust is not entitled to exemption on the reasoning that the Legislature has already provided tax relief for open space land pursuant to the Farm and Open Space Tax Law, 36 M.R.S. §§ 1101-1121, citing the reasoning of *Cushing*, 2001 WL 1729095, at *6. Likewise, the Town argues that the Legislature, in enacting the Farm and Open Space Tax Law, intended it to be the exclusive method of taxing open space land.

[¶24] This reasoning does not withstand scrutiny. The charitable exemption now codified in section 652(1) is well established in Maine law, tracing its origins back to the 1800s. *See Hebron Acad.*, 2013 ME 15, ¶¶ 14-15, 60 A.3d 774. Nothing in the language or legislative history of the Farm and Open Space Tax Law, originally enacted in 1971, *see* P.L. 1971, ch. 548 (effective Sept. 23, 1971), indicates any intent to preempt or otherwise displace this longstanding exemption

in the context of land conservation. Although the Farm and Open Space Tax Law provides that "[t]he assessor *shall* determine" whether the land is open space land, and that, if so, "that land *must* be classified as open space land and subject to taxation under this subchapter," 36 M.R.S. § 1109(3) (emphasis added), that provision only comes into effect upon the landowner's "*election* to apply" for taxation pursuant to the statute, *id.* § 1103 (emphasis added). The Legislature, in other words, specifically made the application of the Farm and Open Space Tax Law voluntary on the part of the taxpayer. That the statute's valuation methodology recognizes and adjusts for the restricted nature of open space land, *see id.* § 1106-A, does not demonstrate legislative intent to tax such land when it is owned and used by a charitable institution.

[¶25] The Farm and Open Space Tax Law and the charitable exemption are distinct in their scope and purpose. The Farm and Open Space Tax Law describes its purpose as follows:

> It is declared that it is in the public interest to encourage the preservation of farmland and open space land in order to maintain a readily available source of food and farm products close to the metropolitan areas of the State to conserve the State's natural resources and to provide for the welfare and happiness of the inhabitants of the State, that it is in the public interest to prevent the forced conversion of farmland and open space land to more intensive uses as the result of economic pressures caused by the assessment thereof for purposes of property taxation at values incompatible with their preservation as such farmland and open space land, and that the

necessity in the public interest of the enactment of this subchapter is a matter of legislative determination.

36 M.R.S. § 1101. In contrast with the specific, conservationist purposes of the Farm and Open Space Tax Law, the charitable exemption seeks to encourage all activities that are "for the benefit of an indefinite number of persons" and "lessen[] the burdens of government" by providing services in which the state has a genuine interest. *See Christian Fellowship*, 2006 ME 44, ¶¶ 14, 23, 896 A.2d 287 (quotation marks omitted) (defining "charitable" and noting a legislative study indicating that "the original purposes of the charitable exemption were to promote not only providing services in lieu of government services, but also providing a service in which the state has a genuine interest" (quotation marks omitted)); *see also New England Forestry Found.*, 9 N.E.3d at 316 (noting that Massachusetts's charitable exemption "does not seek to encourage charitable organizations to pursue particular substantive policy goals or charitable activities," but rather exempts certain property from taxation "on the theory that property held for philanthropic, charitable, religious, or other quasi public purposes in fact helps to relieve the burdens of government").

[¶26] Although some of the factors by which the Farm and Open Space Tax Law defines open space land could be relevant in the application of the charitable exemption, *see* 36 M.R.S. §§ 1102(6), 1109(3), open space land may be held by an

individual or entity that does not qualify for a charitable exemption for any number of reasons, *see, e.g., id.* § 652(1)(A) (requiring that an organization be "incorporated by this State" in order to be entitled to exemption as a charitable institution); *Nature Conservancy of the Pine Tree State, Inc. v. Town of Bristol*, 385 A.2d 39, 43 (Me. 1978) ("Land held in its natural state does not become tax exempt by transfer to a charitable institution where the grantor retains the rights to access, passage or custodianship, more particularly since these tend to be the only private rights of ownership exercised while land is privately being held in its natural state."). That the two statutes might overlap in their application to a particular taxpayer does not indicate legislative intent that one statute "preempt" the other. *See New England Forestry Found.*, 9 N.E.3d at 315-16 (holding that a Massachusetts statute providing tax incentives for owners of undeveloped forest land did not preempt the Massachusetts charitable exemption statute because the statutes served distinct purposes and contained no language indicating that they were mutually exclusive).

[¶27] The Town correctly notes that when two statutes are in conflict, "we favor the application of a specific statutory provision over the application of a more general provision." *Cent. Me. Power Co. v. Devereux Marine, Inc.*, 2013 ME 37, ¶ 22, 68 A.3d 1262. We will not, however, read into the exemption statute and the Farm and Open Space Tax Law a conflict where none exists. *See*

*Fernald v. Shaw's Supermarkets, Inc.*, 2008 ME 81, ¶ 19, 946 A.2d 395; *Yeadon Fabric Domes, Inc. v. Me. Sports Complex, LLC*, 2006 ME 85, ¶ 20, 901 A.2d 200.

C.      Conclusion

[¶28]    Under the circumstances of this case, the Trust is entitled to exemption as a charitable and benevolent organization.  Because we conclude that the Trust's property is exempt, we do not reach the issue of valuation.

The entry is:

> Judgment of the Superior Court vacating the decision of the State Board of Property Tax Review affirmed.

---

**On the briefs:**

Leah B. Rachin, Esq., Bergen & Parkinson, LLC, Kennebunk, for appellant Town of Limington

David A. Lourie, Esq., Portland, for appellee The Francis Small Heritage Trust, Inc.

Karin Marchetti-Ponte, Esq., Maine Coast Heritage Trust, Mount Desert, and Robert H. Levin, Esq., Portland, for amici curiae Maine Coast Heritage Trust and Land Trust Alliance, Inc.

**At oral argument:**

Leah B. Rachin, Esq., for appellant Town of Limington

David A. Lourie, Esq., for appellee The Francis Small Heritage Trust, Inc.

Karin Marchetti-Ponte, Esq., for amici curiae Maine Coast Heritage Trust and Land Trust Alliance, Inc.